NEW YORK STATE DIVISION OF HUMAN RIGHTS, on Complaint of BERNICE GERA, Respondent, *v.* NEW YORK-PENNSYLVANIA PROFESSIONAL BASEBALL LEAGUE et al., Petitioners.

Fourth Department, April 27, 1971.

*Donovan, Leisure, Newton & Irvine (George S. Leisure, Jr.,* of counsel), for National Association of Professional Baseball Leagues and another, petitioners.

*Robert E. Walsh* (*George S. Leisure, Jr.,* of counsel), for New York-Pennsylvania Professional Baseball League and another, petitioners.

*Mario Biaggi* for respondent.

*Henry Spitz* (*Alan J. Saks* of counsel), for State Division of Human Rights.

MARSH, J. Petitioners, New York-Pennsylvania Professional Baseball League and Vincent McNamara, its president, and the National Association of Professional Baseball Leagues and Phillip Piton, its president, in a proceeding pursuant to section 298 of the Eexcutive Law, seek review and reversal of the decisions and orders entered by the Commissioner of the State Division of Human Rights and the Human Rights Appeal Board on the complaint of Bernice Gera. The orders of the Commissioner, affirmed with slight modification by the Appeal Board, determined, after a hearing, that petitioners had barred complainant from employment as an umpire because of her sex in violation of section 296 of the Executive Law and directed petitioners to cease and desist such unlawful discriminatory practice and to take certain affirmative action with respect to New York teams and leagues, including the establishment of new physical standards which shall have a reasonable relation to the requirements of the duties of umpires and which do not discriminate against women as a group and other groups having smaller average stature than American men. The further direction was made that petitioners reconsider complainant's application for employment as an umpire with reference to such new physical standards.

The record on which the decision and orders under review were based reveals that the complainant, a female, was born June 14, 1931, is 5 feet 2 inches in height and weighs 129 pounds. She had played on her high school softball team, coached Little League teams and umpired games sponsored by the American Legion, Catholic Youth Organization, YMCA and the New York Police Department as well as at the Bridgeton, N. J. Semi-Professional Tournament and the National Baseball Congress, a league composed of semi-professional teams in Wichita, Kansas. Early in 1967, using the first name " Bernie " and concealing her sex, she made an application for admission to the Al Somers School for umpires setting forth her age as 35, weight as 144 pounds and height as 5 feet 3 inches. The Al Somers School was approved, supervised and subsidized by the Baseball Umpire Development Program, which was organ-

ized under major league sponsorship in December, 1964, five months after the enactment of the Federal Civil Rights Act, to establish standards for minor league umpires. Umpires hired by the various minor leage presidents, subject to the approval of the president of the National Association, were required to be approved by the Baseball Umpire Development Program in order to secure payment of major league subsidies. The Baseball Umpire Development Program established as qualifications for umpires an age limit of 35, minimum height of 5 feet 10 inches, minimum weight of 170 pounds, graduation from high school and from an approved umpire school.

Despite her obvious lack of physical qualifications required by the Umpire Development Program, the Somers School upon receiving complainant's application advised her by letter that she would be welcome to join the next class the following year. Upon telephoning the school to advise them of her sex she was told by Somers that since she had raised an important policy matter it would have to be discussed with the administrator of the Baseball Umpire Development Program and she would be further advised. No additional acknowledgment was received concerning her application to the Somers School.

In the summer of 1968 complainant wrote the petitioner, McNamara, president of the New York-Pennsylvania League, requesting an application for an umpiring position without setting forth her qualifications. In response McNamara outlined various objections to hiring a female umpire and concluded: '' It is our professional opinion that it would be unwise to expose you or any other lady to situations such as those stated previously above.''

Subsequently complainant instituted a proceeding against the New York-Pennsylvania League and McNamara. While the proceeding was pending McNamara mailed an umpire questionnaire to complainant which she returned properly listing her age, height and weight. McNamara thereupon mailed a contract to her which she signed and returned and which he transmitted with his signature to petitioner Piton as president of the National Association for his approval, stating however to Piton, that he tendered the contract even though he did not consider complainant qualified, because of his having been importuned by the complainant and the Human Rights Commission. He said further that he felt that he had to execute the contract despite her lack of qualifications knowing that Piton would have to make the final decision. Piton disapproved the contract advising complainant that the National Associa-

tion was guided by the standards established by the Umpire Development Program having to do with height, weight and age and that based upon her failure " to meet the physical requirements for admission to the Umpire Development Program and for employment by the National Association Leagues I have no alternative but to disapprove and invalidate your proposed contract."

While as president of the National Association, Piton was required to approve all player and umpire contracts in the minor leagues, he testified that he was not sure he knew of the required standards as to height, weight and age prior to the summer of 1967 when complainant first made known her interest in umpiring in professional baseball.

Section 296 of the Executive Law provides: " 1. It shall be an unlawful discriminatory practice:

" (a) For an employer, because of the age, race, creed, color, national origin or sex of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. * * *

" 6. It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

Whatever policy organized baseball may conceive to be in its best interests must yield to a public policy established in the interests of the whole of society as evidenced by the statutory law of the State.

Petitioners contend that the " bona fide occupational qualification " exception to the law (Executive Law, § 296, subd. 1, par. [d] and Civil Rights Act of 1964, § 703, subd. [e]; U. S. Code, tit. 42, § 2000e-2, subd. [e]) is applicable herein and permits restricting the hiring of umpires to those of the male sex. This contention is unsound. Recent court decisions have required that this exception be affirmatively proved by the party claiming it. (*Weeks* v. *Southern Bell Tel. & Tel. Co.*, 408 F. 2d 228; *Bowe* v. *Colgate-Palmolive Co.*, 416 F. 2d 711; *Cheatwood* v. *South Cent. Bell Tel. & Tel. Co.*, 303 F. Supp. 754; *Richards* v. *Griffith Rubber Mills*, 300 F. Supp. 338.) The courts have given this provision a narrow construction. In *Weeks* v. *Southern Bell Tel. & Tel. Co.* (*supra*, p. 235) the Court of Appeals for the Fifth Circuit stated: " We hold that in order to rely on the bona fide occupational qualification exception an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing,

that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.''

Petitioners have not introduced evidence to support a factual basis for belief that women are not qualified for the job of a professional baseball umpire. Essentially the only evidence on this point is that the job would require some physical strain, travel and loss of weight, with a possibility of some physical injury. In the *Weeks* case (*supra*) the court stated that characterizing a job as '' strenuous '' does not meet the burden required to show a bona fide occupational qualification and few jobs of a strenuous character do not involve some risk of physical injury.

Further support for the proposition that the bona fide occupational qualification exception does not apply to the position in question is found in the guidelines set down by the Equal Employment Opportunity Commission construing this provision. (See Code of Fed. Reg., tit. 29, § 1604.1, subd. [a].) The courts have held that such guidelines are entitled to '' great deference ''. (*Udall* v. *Tallman*, 380 U. S. 1, 16; *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542 [concurring opinion, MARSHALL, J.] ; *Weeks* v. *Southern Bell Tel.*, *supra*.) Those guidelines have construed the bona fide occupational qualification exception very narrowly. They reject the proposition that an employer can refuse '' to hire an individual based on stereotyped characterizations of the 'sexes.'' (Code of Fed. Reg., tit. 29, § 1604.1, subd. [a], par. [1], subpar. [ii].) According to the commission the exception is primarily to apply '' where it is necessary for the purpose of authenticity or genuineness   *   *   * i.e. an actor or actress.'' (Code of Fed. Reg., tit. 29, § 1604.1, subd. [a], par. [2].)

Significantly, and quite in opposition to the position now asserted by petitioners that being of the male sex is a bona fide occupational qualification for the hiring of umpires and that as a practical business policy baseball should not be required to hire female umpires, Bernard Deary, administrator of the Umpire Development Program testified that a female applicant meeting the age, height and weight requirements of the Umpire Development Program and a graduate of an approved course would be recommended to the leagues for hiring as an umpire. Petitioner Piton as president of the National Association also testified that sex was no factor in his decision to disapprove complainant's contract.

In the light of the foregoing it would appear that it has not been established that being of the male sex is a bona fide

occupational qualification for an umpire or that, as a matter of policy, hiring of umpires should be restricted to males.

It is uncontroverted that complainant failed to meet the height and weight standards required by petitioners and that such standards bar all but less than 1% of women for consideration of employment as professional baseball umpires. Our concern therefore is with whether the record supports the Commissioner's findings that petitioners have not established that these standards bear a reasonable relation to the requirements of the job.

Various witnesses for petitioners testified that the physical qualifications for a professional baseball umpire require that he be 5 feet 10 inches tall and 170 pounds in weight. Testimony was given that these standards were "born of the judgment of men with long experience in professional baseball", that an umpire "must be a person who commands respect of big fellows, big men", also to the increased size of professional baseball catchers, the possibility of confrontation with big athletes, physical strain, travel conditions, and length of games. While these factors are entitled to be taken into consideration in the hiring of an umpire, none of them, either individually or collectively, justify an inflexible standard of 5 feet 10 inches and 170 pounds. Despite testimony that very little deviation was permitted from these standards, considerable evidence appears to the contrary. This is not to say that these standards were created with the intent to prevent complainant or other women from receiving consideration for employment. Rather, it is meant that the failure to meet these standards should not be considered a per se cause to bar such employment in the light of the uncontroverted evidence that such standards are inherently discriminatory. While undoubtedly height and weight are important in judging a person's ability to stand physical strain, it has not been demonstrated that persons 5 feet 10 inches and over are the only people capable of withstanding such strain. The evidence indicates that in the past, professional baseball umpires in both the major and minor leagues, including the petitioner McNamara, the present administrator of the Baseball Umpire Development Program Bernard Deary, and the legendary Bill Klem of major league fame, failed to meet the standard height of 5 feet 10 inches or weight of 170 pounds with no indication of any deficiency in the quality of their performance. It would appear therefore, that the findings of the Commissioner were proper, and that the standards applied by the petitioners, inherently discrimina-

tory against women, have not been justified in the record. The finding of discrimination based upon sex was a logical conclusion and is supported by the record as a whole.

Two other requirements were allegedly applied by petitioners to bar complainant's employment: age and graduation from an approved umpire training school. In view of the conflicting evidence produced as to the consistency of the application of these standards, the Commissioner's findings of discrimination are supported· by the record. Moreover, there is no evidence that complainant would not have the knowledge, ability and skill to qualify for an umpire position. In fact the evidence demonstrated considerable previous experience in semi-professional, American Legion and youth organization baseball as well as graduation from an umpiring school from which organized baseball had taken umpires.

The finding that petitioner McNamara discriminated against complainant because she was a woman and by not affording her equal treatment with that accorded to male applicants is clearly established by the evidence. The finding that he failed to send complainant an application for an umpiring position is not inconsistent with the finding in the proceeding against the National Association and Piton which states that such an application was sent. The sending of this application by McNamara while this proceeding was pending, under all the circumstances presented was an equivocal act from which the Commissioner could draw various conclusions especially in light of the testimony of Piton that McNamara's " decision to hire " the complainant was merely an attempt to throw it in the lap of his superiors. This type of action appears to be one of those " subtleties of conduct " that are important factors in cases of alleged discrimination and therefore a court should not attempt to substitute its judgment for that of the Commissioner. (*Matter of Lawrence Gardens* v. *State Comm. for Human Rights,* 53 Misc 2d 20, affd. sub nom. *Matter of State Comm. for Human Rights* v. *Lawrence Gardens,* 28 A D 2d 1139.)

Petitioners assert that the application of the provisions of the Executive Law and the Commissioner's orders thereunder constitute an unreasonable burden on interstate commerce and should be struck down by the court. The ultimate question comes down to the nature and extent of the burden which the State's regulation imposes on interstate commerce. (*Southern Pacific Co.* v. *Arizona,* 325 U. S. 761.) In *Head* v. *New Mexico Bd.* (374 U. S. 424, 428) the court quoting from *Huron Portland Cement Co.* v. *City of Detroit* (362 U. S. 440) stated: " ' In

determining whether the state has imposed an undue burden on interstate commerce, it must be borne in mind that the Constitution when "conferring upon Congress the regulation of commerce, * * * never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." '"

In order for a State statute, otherwise valid, to be struck down there must be found " ' such actual conflict between the two schemes of regulation that both cannot stand in the same area, [or] evidence of a congressional design to preempt the field.' " (*Head* v. *New Mexico Bd., supra,* p. 430). In *Colorado Comm.* v. *Continental* (372 U. S. 714) the court unanimously held that Colorado's requirement that the defendant airlines company refrain from racial discrimination in its hiring of pilots does not unduly burden interstate commerce.

The application of the Executive Law to prohibit the use of discriminatory standards in New York would not be susceptible to any conflict with regulations in other States. Discriminatory standards which foreclose the employment of persons based on sex have been held invalid under title VII of the Civil Rights Act of 1964 and more recently by the United States Supreme Court. (*Phillips* v. *Martin Marietta Corp.,* 400 U. S. 542.)

Accordingly, as in *Colorado Comm.* v. *Continental* (*supra*) the possibility of diverse regulations is nonexistent. Therefore, the holding in that case lends significant support to the proposition that a State requirement that New York baseball leagues and teams refrain from discrimination based upon sex in the hiring of umpires does not unduly burden interstate commerce.

By section 298 of the Executive Law it is provided that the findings of fact of the division " shall be conclusive if supported by sufficient evidence on the record considered as a whole ". Substantial evidence to support the division's findings is sufficient and precludes this court from holding to the contrary (*Matter of Moskal* v. *State Division of Human Rights,* 36 A D 2d 46; *Matter of Kindt* v. *State Comm. for Human Rights,* 44 Misc 2d 896, mod. on other grounds 23 A D 2d 809, affd. 16 N Y 2d 1001).

The findings made in the proceedings under review are amply supported in the record and petitioners' motion should be denied and the petition dismissed, and the order of the Human Rights Appeal Board should be confirmed and petitioners directed to comply therewith.

GABRIELLI, J. (dissenting). In order to affirm, we must first conclude that Bernice Gera was refused employment as a professional baseball umpire by the petitioners herein solely because of her sex. The record does not sustain a finding that she was discriminated against because of her sex. Indeed, it appears that she was refused employment for good and sufficient reasons unrelated to her sex. It follows, therefore, that the order cannot stand and, as a concomitant, the directives to cease certain unsustained charged practices and the further requirement that petitioners forthwith promulgate and submit for approval certain new rules in relation to the hiring practices of umpires, may not be sustained.

The minimum standards for umpire applicants, having no relationship to sex, were promulgated several years ago and well prior to the application made by Bernice Gera. The adoption of these standards were acts which cannot be termed arbitrary or capricious, but were the sum total of the considered judgment of people with long experience in professional baseball and, equally as important, were concurred in and approved by managerial executives of organized baseball including the members of the Umpire Development Committee, the president of the American League, the president of the National League and the supervisors of umpires for both major leagues. The record clearly demonstrates that these standards and rules bear a reasonable relationship to the needs of the sport and the occupational requirements of the duties of an umpire. Evidence from the records of the Office for Baseball Umpire Development demonstrates that these standards have been consistently enforced since their inception in 1965.

The order should be reversed and petitioners' motion for dismissal of the complaint should be granted.

CARDAMONE, J. (dissenting). I concur in the dissenting opinion of GABRIELLI, J. and on three additional grounds: (1) the failure to join a "necessary party"; (2) a bona fide occupational qualification exists here; (3) the regulation of baseball is a matter of predominant national concern not amenable to State-by-State regulation.

At a meeting on December 4, 1964 in Houston, Texas, a number of major league general managers established the Office for Baseball Umpire Development to improve the quality of minor league umpiring on a national basis. Edward S. Doherty was named administrator and authorized to establish minimum standards and qualifications for umpire applicants. The standards under attack here were promulgated in 1965. In December,

1967 complainant telephoned Mr. Doherty to inquire about becoming an umpire and was advised by him that she did not meet the established standards. On October 12, 1968 Mrs. Gera wrote Doherty as administrator of the office requesting an application to become an umpire. Doherty forwarded a form letter to complainant on October 28, 1968 enclosing an umpire questionnaire which complainant completed and returned on November 10, 1968. Phillip Piton, president of petitioner the National Association of Professional Baseball Leagues, an unincorporated association generally referred to as the " minor leagues ", testified that it is not his function to set umpire standards, to handle them or to have anything to do with them. The Office for Baseball Umpire Development which promulgated the umpire standards is charged with their application. As such it was a " necessary party " in the proceeding before the commission as that term is defined* in the Human Rights Law. The record clearly establishes that this office was organized by the major leagues and completely financed by it. It is a distinct and separate entity from petitioner National Association and is not under the control of it or any of these petitioners. Its office is in Columbus, Ohio, and it has no office in this State. Plainly complainant here, as a result of her numerous contacts with it, was aware of the functions of the Office for Baseball Umpire Development. Despite this, the office was never made a party to any of the proceedings below. The majority ignores the fact that to implement the relief ordered, the Office for Baseball Umpire Development is a necessary party.

Title VII enacted by Congress in 1964 for the first time made it an unlawful employment practice to refuse to hire an individual on account of sex, but at the same time recognized the concept of a bona fide occupational qualification as a justification for excluding certain categories of employees where reasonably necessary to the normal operation of a particular business (Civil Rights Act of 1964, tit. VII, § 701 *et seq.*; U. S. Code, tit. 42, § 2000e–2, subd. [e]). The standards promulgated by the Office for Baseball Umpire Development constitute a practical policy evolved from long experience justified as reasonably necessary to the normal operations of professional baseball and are not, per se, an unlawful discriminatory practice (cf. *Matter of Eastern Greyhound Lines* v. *New York State*

---

*The term " necessary party " means any person who has such an interest in the subject matter of a proceeding under this article, or whose rights are so involved, that no complete and effective disposition can be made without his participation in the proceeding (Executive Law, § 292, subd. 16).

*Div. of Human Rights,* 34 A D 2d 916, 917, affd. 27 N Y 2d 279).

The commission's order improperly implements a State law in a manner which constitutes an unreasonable burden on interstate commerce (*Morgan* v. *Virginia,* 328 U. S. 373, 386). The regulation of commerce conferred by the Constitution on Congress was never intended to cut the States off from legislating on subjects which might indirectly affect the commerce of the country (*Head* v. *New Mexico Bd.,* 374 U. S. 424). Rather, it left to the States wide scope for regulation of matters of local State concern even though it in some measure affects commerce, provided such regulation does not interfere in matters with respect to which uniformity of regulation is of predominant national concern (*Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 770). The need for uniformity in the regulation of organized professional baseball — an intercity, intersectional, interstate, and today, international sport — has long been recognized. The regulation of baseball by local State implementation has been held foreclosed by the Supremacy and Commerce Clauses of the United States Constitution (*Wisconsin* v. *Milwaukee Braves,* 31 Wis. 2d 699, cert. den. 385 U. S. 990). The application of diverse State law would seriously disrupt the operation of organized baseball (cf. *Flood* v. *Kuhn,* 316 F. Supp. 271, 279–280). Baseball is subject to the jurisdiction of the National Labor Relations Board due to its very nature as an interstate activity (*American League and Assn. of Umpires,* 180 NLRB No. 30, Case 1-RC-10414, par. 21.448 [Dec. 15, 1969]). Uniformity of regulation in this area has thus been recognized as of predominant national concern and that uniformity may not be achieved by the contrived uniformity of adopting the strictest State standard (*Sothern Pacific Co.* v. *Arizona, supra,* pp. 774–775). To say, as the majority does, that the threat of diverse or conflicting regulations in a State-by-State determination of umpire qualifications is nonexistent is too broad a prophecy for such a controversial and litigated field. Even were there no possibility of such conflict (*Colorado Comm.* v. *Continental,* 372 U. S. 714; *California* v. *Zook,* 336 U. S. 725, 735) we should acknowledge that in the regulation of baseball, a sport traditionally known as our national pastime the predominant concern is national, and recognize that, pragmatically, organized baseball is not amenable to effective State-by-State regulation. I vote to reverse and dismiss the complaint.

GOLDMAN, P. J., and WITMER, J., concur with MARSH, J.; GABRIELLI and CARDAMONE, JJ., dissent and vote to reverse and to dismiss the complaint, in separate opinions.

Motion denied and petition dismissed, without costs; order of the State Human Rights Appeal Board confirmed and petitioners directed to comply therewith.

