STATE DIVISION OF HUMAN RIGHTS on Complaint of RAYMOND FREEMAN, Petitioner, v XEROX CORPORATION, Respondent.

Fourth Department, July 18, 1975

*Monroe County Legal Assistance Corp. (Daan Braveman* of counsel), petitioner.

*Harris, Beach & Wilcox (Howard R. Moore, Jr.* and *Richard N. Chapman* of counsel), for respondent.

MAHONEY, J. This is a proceeding pursuant to section 298 of the Executive Law, seeking judicial review of determination and order of the State Division of Human Rights (Division) dated July 3, 1974, which dismissed petitioner's complaint without a hearing for lack of probable cause, and the affirming decision and order of the State Human Rights Appeal Board (Appeal Board) dated January 20, 1975.

Petitioner, Raymond Freeman, a black employee of respondent Xerox Corporation, by verified complaint alleged unlawful discriminatory practice relating to employment by denial of equal terms, conditions and privileges of employment in suspending him from employment. The pertinent factual allegations of the complaint are that petitioner had been arrested and charged with assault of a State trooper while traveling on the New York State Thruway as a result of which arrest petitioner was placed on indefinite suspension of employment by Xerox pending final disposition of his legal status. Petitioner further alleged that he was black and, based on his

foregoing allegations, he charged Xerox with an unlawful discriminatory practice relating to employment because of his race and color, in violation of section 296 of the Executive Law (New York Human Rights Law).

Following the filing of the complaint as provided under subdivision 2 of section 297 of the Executive Law, an investigation was made by the Division to determine jurisdiction and probable cause as to whether Xerox had or was engaged in an unlawful discriminatory practice. A conference was held attended by petitioner, without counsel, and respondent Xerox by counsel and its Industrial Relations Specialist. A summarization of that investigation and report reflects that Xerox has an established policy in treatment of employees arrested and charged with serious violations of the law, which policy entailed company review of the facts and circumstances of the specific case, with authorized discretionary suspension pending legal disposition of the charges against the subject employee.

At the investigation conference Robert Hayes, Industrial Relations Specialist of Xerox, stated that petitioner's arrest was brought to his attention through a newspaper publication story of the incident, a copy of which was submitted as an exhibit. After confirming the accuracy of the published report by the company's Security Division, it was the joint determination of Hayes and his immediate supervisor to suspend petitioner from employment pending legal disposition of petitioner's case. Hayes further stated that the "seriousness of the allegations", which involved a "crime of violence" required that determination in order for the company to safeguard its employees. Supplementing the investigation conference, Xerox submitted five case files involving white employees who were placed on suspension following arrest pending legal disposition of their respective cases.

The investigation proceeding of the Division culminated in a determination and order dismissing the petitioner's complaint for "no probable cause."

From the Division's determination and order, petitioner appealed to the State Human Rights Appeal Board. Petitioner on said appeal, there appearing by counsel, urged reversal of the Division's determination and order of dismissal of the complaint, citing *State Div. of Human Rights v. Kilian Mfg. Corp.* (35 NY2d 201) and relying on statistical data evidencing that a greater proportion of blacks are arrested than whites. As a consequence thereof, citing *Matter of Sontag v. Bronstein*

(33 NY2d 197), counsel contended that Xerox' policy of suspension in case of an employee's arrest has a racially discriminatory practice. The Appeal Board acknowledged impermissible discriminatory practice. The Appeal Board acknowledged the propriety of the acceptance of statistical data relied upon by petitioner's counsel and the theory of resulting racially discriminatory impact, with a shifting of the burden to the employer affirmatively to legitimatize its action. The Appeal Board however distinguished the instant case as involving the suspension of a black already employed, whose suspension was the result of a *voluntary act* which involved petitioner's arrest for a "serious crime," which policy was equally applied to all employees; and determined that Xerox' suspension policy "appears to be a business judgment" obviating probable cause that such action was an unlawful discriminatory practice.

Petitioner, in urging reversal of the respective orders of the Division and Appeal Board in dismissal of the petitioner's complaint without a hearing for lack of probable cause, contends (a) that Xerox' policy of suspending persons who are arrested has a racially discriminatory impact; (b) that the record is devoid of proof of business necessity justifying such discriminatory practice; and (c) that the determination and order of the Division and Appeal Board are arbitrary and without support in law or in fact.

We stated in *State Div. of Human Rights v. Buffalo Auto Glass Co.* (42 AD2d 678): "In order to obtain a hearing (Executive Law, § 297, subd. 4, par. a) more than a simple question of fact must appear, otherwise a hearing would be mandated in all cases and the conference and conciliation procedures established by the statute would serve no purpose. Instead, a hearing is required when questions of fact result from a conference and upon granting full credence, as the Division must, to the complainant's version of the events, there is evidence of unlawful discrimination." On the facts of the case before us, it is obvious that, giving full credence to the petitioner's complaint, there is no evidence of unlawful discrimination because of race, sex, color, creed or national origin, inasmuch as the same policy applies to all employees, not only to those who happen to be nonwhites.

An analysis of decisional law on the subject would indicate limitation to automatic self-executing criteria involving non-job-related standards. That is to say, qualification or disqualification thereby results in automatic suspension affecting em-

ployment and terms or privileges thereunder (see *Griggs v. Duke Power Co.,* 401 US 424; *Bridgeport Guardians v Members of Bridgeport Civ. Serv. Comm.,* 482 F2d 1333 [involving standardized general intelligence tests]; *Robinson v Lorillard Corp.,* 444 F2d 791; *United States v St. Louis-San Francisco Ry. Co.,* 464 F2d 301, cert den 409 US 1116 [involving promotional forfeiture of seniority, where prestatutory civil rights discrimination existed]; *Matter of Sontag v Bronstein,* 33 NY2d 197, *supra; New York State Div. of Human Rights v New York-Pennsylvania Professional Baseball League,* 36 AD2d 364, affd 29 NY2d 921; *State Div. of Human Rights v New York City Dept. of Parks & Recreation,* 38 AD2d 25 [involving arbitrary physical standards]; *Board of Educ. of Union Free School Dist. No. 2, East Williston, Town of North Hempstead v New York State Div. of Human Rights,* 42 AD2d 49, affd 35 NY2d 673; *Union Free School Dist. No. 6 v New York State Human Rights Appeal Bd.,* 35 NY2d 371 [involving mandatory maternity leaves of absence]).

In the instant case Xerox' suspension policy is not so self-executing and automatic. An arrest for a serious violation merely sets in motion a rational procedure for review by the company of all facts and circumstances with possible discretionary implementation by suspension. While such policy might conceivably be "pregnant" with possible discriminatory implementation or enforcement, no such evidence here appears in the record. Rather, petitioner relies solely *upon statistical evidence and the racially discriminatory impact therefrom.* If suspension were the automatic result of arrest under Xerox' policy, petitioner's argument would, under decisional law, have merit. However, upon our analysis such suspension policy of Xerox accorded discretionary determination to be made *in each individual case;* and absent any proof in the record of other factors to establish discriminatory implementation thereof, the Division's determination and order, in finding no probable cause and dismissal of petitioner's complaint as affirmed by the Appeal Board, was neither arbitrary nor capricious and was in all respects proper. Such conclusion renders immaterial the resolution of any factual issue concerning business necessity or justification, as urged by petitioner. (See *Matter of Jwayyed v New York Tel. Co.,* 42 AD2d 663; *State Div. of Human Rights v Buffalo Auto Glass Co.,* 42 AD2d 678; *Matter of Pepsi-Cola Metropolitan Bottling Co. v State Human Rights Appeal Bd.,* 42 AD2d 760; *Eastman*

*Kodak Co. v State Div. of Human Rights,* 44 AD2d 888; *Matter of New York Tel. Co. v Wethers,* 36 AD2d 541, affd 30 NY2d 791.)

The determination should be confirmed.

CARDAMONE, J. (dissenting). Petitioner is a black male who has been employed by Xerox as an assembler and stock handler for five years. In 1974 petitioner was stopped for speeding. An altercation ensued and he was arrested. As a result he was suspended from his employment. Upon petitioner's complaint to the State Human Rights Division, it conducted an investigation and held an informal conference following which it made a finding of no probable cause which was affirmed by the Human Rights Appeal Board.

The majority have voted to confirm this determination. I respectfully dissent and vote to reverse and remit this matter to the State Division of Human Rights to accord petitioner his right to a public hearing on the merits which he was improperly denied.

The pivotal question presented is whether respondent's policy of suspension based upon a consideration of an employee's record of arrests for "serious violations of law" constitutes an unlawful discriminatory practice where it may be statistically demonstrated that blacks are subject to arrests in disproportionate numbers to their race than are whites. In my view this policy is discriminatory in effect notwithstanding the lack of intent or motive on respondent's part to discriminate and, absent a showing of business necessity, violates the Human Rights Law of this State. Such conclusion is bottomed on the rationale enunciated by the Supreme Court in *Griggs v Duke Power Co.* (401 US 424) where an otherwise seemingly neutral employment policy was held to operate to exclude blacks despite the absence of any discriminatory intent. The Supreme Court stated that employment procedures that operate as "built-in headwinds" for minority groups and that are unrelated to measuring job capability should be prohibited (401 US, at p 432).

New York has adopted a similar attitude towards employment practices which, although they appear to be neutral on their face or even neutral in terms of intent, adversely affect equal employment opportunity for a protected class of persons. Such practices have consistently been struck down by the appellate courts in this State. In most of those cases prima

facie proof of the *de facto* discrimination has utilized statistical evidence. (See, e.g., *State Div. of Human Rights v Kilian Mfg. Co.,* 35 NY2d 201; *Matter of Sontag v Bronstein,* 33 NY2d 197; *New York State Div. of Human Rights v New York-Pennsylvania Professional Baseball League,* 36 AD2d 364, affd 29 NY2d 921; *State Div. of Human Rights v New York City Dept. of Parks & Recreation,* 38 AD2d 25.)

In the instant case there can be little doubt that the relevant statistical evidence establishes that the use of arrest records as a factor in the consideration of employment, discharge, suspension or any other term or condition of employment has a disproportionately adverse effect upon blacks than whites. Although the use of arrest records as an impermissibly discriminatory device appears to be a case of first impression in New York, several Federal courts have previously recognized the adverse effect that the use of arrest data has had on black employment. In *Gregory v Litton Systems* (316 F Supp 401, mod 472 F2d 631), Litton's policy of refusing to hire frequently arrested persons was conceded to be objectively applied and enforced without reference to race. Nevertheless, the discriminatory impact and consequences of such a policy were sufficient to invalidate the policy regardless of the absence of an intent to discriminate. The Ninth Circuit Court of Appeals further noted (p 632) that, "[h]istorical discrimination need not be shown in order to obtain relief from discrimination in fact, regardless of its cause or motive" (see, also, *Carter v Gallagher,* 452 F2d 315 [where court held that conviction records may properly be considered in employment decisions under proper guidelines but that arrest records and certain written tests were impermissibly discriminatory]).

The only question remaining is whether respondent has demonstrated a business necessity. Only substantial evidence of business necessity, job relatedness, or bona fide occupation qualification will excuse the discriminatory impact of an employment policy and there must be "no acceptable alternative that will accomplish that goal 'equally well with a lesser differential racial impact'." *(United States v St. Louis-San Francisco Ry. Co.,* 464 F2d 301, 308, cert den 409 US 1116.)* In this regard mere conclusory statements of business necessity are not enough *(Wallace v Debron Corp.,* 494 F2d 674; *Gregory v Litton Systems, supra).* Business necessity or job relatedness must be affirmatively proved by the party claiming it *(Weeks v Southern Bell Tel. & Tel. Co.,* 408 F2d 228; *Bowe v Colgate-*

*Palmolive Co.,* 416 F2d 711; *Cheatwood v South Cent. Bell Tel. & Tel. Co.,* 303 F Supp 754; *New York State Div. of Human Rights v New York-Pennsylvania Professional Baseball League, supra).* Business necessity in this context means that the employment policy must be "essential to the safe and efficient operation of the business" *(Gregory v Litton Systems, supra,* p 403). Unless the employer can establish that job performance depends upon sensitive security, fiduciary responsibility or that persons who are arrested perform less honestly or less efficiently than other persons no business necessity has been established (see *Richardson v Hotel Corp. of Amer.,* 332 F Supp 519, affd 468 F2d 951). Similarly, the United States Equal Employment Opportunity Commission has determined that personnel decisions based upon arrest record data violate the antidiscrimination laws unless justified by legitimate business considerations) (EEOC Dec. No. 74-83, CCH Emp. Prac. Guide ¶ 6414 [Feb. 7, 1974]; EEOC Dec. No. 74-92, CCH Emp. Prac. Guide ¶ 6424 [Feb. 21, 1974]; EEOC Dec. No. 74-90, CCH Emp. Prac. Guide ¶ 6423 [Feb. 15, 1974]; EEOC Dec. No. 74-02, CCH Emp. Prac. Guide ¶ 6386 [July 10, 1973]). The courts have repeatedly held that these guidelines are entitled to "great deference" *(Udall v Tallman,* 380 US 1, 16; *Phillips v Martin Marietta Corp.,* 400 US 542, 544 [concurring opn, MARSHALL, J.]; *New York State Div. of Human Rights v New York-Pennsylvania Professional Baseball League,* 36 AD2d 364, 369, affd 29 NY2d 921). With respect to arrest data particularly, it has been noted that, "The most axiomatic of our criminal presumptions—that a man is innocent until proven guilty—seems to suggest that the arrest means nothing at all. Any predictive significance for job performance it may have will have to be validated by more than mere specification." (Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv. L. Rev. 1109, 1152 [1971]; see, also, Title VII: Discriminatory Results and the Scope of Business Necessity, 35 La. L. Rev. 146 [Fall 1974].)

The majority theorize that an arrest is a "voluntary act" by the petitioner employee, concluding thereby that this fact obviates any employment policy based upon it from the ambit of an unlawful discriminatory practice. Whether or not an arrest is a voluntary act on the part of an employee it should be, per se, an entirely irrelevant consideration in the formulation of employment policy under the Human Rights Law.

No proof of business necessity has been presented in the

instant case to justify respondent's policy. The Appeal Board's determination adjudged this factor simply by stating that respondent's policy *"appears* to be a business judgment." This is hardly enough to justify the use of a prima facie discriminatory practice. Respondent has merely articulated a concern that the presence of persons charged with serious crimes may adversely affect the work performance of that employee and his fellow employees. In my view such concern is not sufficient to eliminate the necessity for a hearing at which respondent has the burden of proving that its concern rises to the level of a legitimate business necessity supported by substantial evidence. On this record only questions of fact are raised. The Division's own field investigation revealed the equivocal nature of the legitimacy of respondent's defense when, upon questioning, respondent's foreman could not say or did not know whether any of complainant's co-workers had complained about working with the petitioner. At best, the present record establishes the erroneous application of law by the agency in focusing upon the motivation and intent of respondent rather than the impact or consequences of the policy.

Thus, the Division and the Appeal Board erred as a matter of law in dismissing the complaint prior to a hearing. "For the Division to dismiss his complaint under such circumstances it must appear virtually that as a matter of law the complaint lacks merit" *(Mayo v Hopeman Lbr. & Mfg. Co.,* 33 AD2d 310, 313). In my view petitioner is entitled to a hearing to test and cross-examine respondent's policy.

MOULE, J. P., SIMONS and DELVECCHIO, JJ., concur with MAHONEY, J.; CARDAMONE, J., dissents and votes to annul the determination and remit the matter for a hearing, in an opinion.

Determination confirmed without costs.