Rev. Herbert BYRD, Plaintiff,

v.

LONG ISLAND LIGHTING COMPANY;
International Brotherhood of Electrical
Workers, Local 1049, Defendants.

No. 77–CV–292.

United States District Court,
E.D. New York.

June 9, 1983.

Supplemental Opinion July 15, 1983.

Warren J. Bennia, New York City, for plaintiff.

Epstein, Becker, Borsody & Green, P.C., New York City, for defendant Long Island Lighting Co.

Quinn & Lilly, P.C., Garden City, N.Y., for defendant Local 1049.

## DECISION AND ORDER

BRAMWELL, District Judge.

Plaintiff, the Reverend Herbert Byrd, a black man, brings this action for unfair employment practices against defendants pursuant to the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 (1976)[1] as well as Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1976).[2] For a pendent state law claim plaintiff alleges a violation of section 296 of the New York State Executive Law. (McKinney 1982).[3] In addition, he sues defendant Local 1049 (1049) for unfair representation pursuant to section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1976). It is plaintiff's contention that from the time of his initial hire by defendant Long Island Lighting Company (LILCO) on August 11, 1969, he was subjected to a discriminatory regime of seniority and testing merely because he was a black man. In addition, it is his contention that defendant Local 1049 of the International Brotherhood of Electrical Workers did not fairly represent him in connection with complaints he lodged arising out of these occurrences. He alleges that LILCO acquiesced and/or participated in this latter practice.

Both defendants now move for orders granting them summary judgment pursuant to Rule 56(c) of the Fed.R.Civ.Pro. Local 1049 also moves for leave to amend its answer pursuant to Rule 15(a) of the Rules. Rule 56 provides that where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law then judgment shall be entered. In making the determination, any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Adickes v. Kress & Co.,* 398 U.S. 144, 157–159, 90 S.Ct. 1598, 1608–

---

1. The statute provides that:

 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

2. With respect to employers 42 U.S.C. § 2000e–2(a) provides that:

 (a) It shall be an unlawful employment practice for an employer—

 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

 With respect to unions 42 U.S.C. § 2000e–2(c) provides that:

 (c) It shall be an unlawful employment practice for a labor organization—

 (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

 (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

 (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

3. Section 296, subd. 1(a) and (c) of the law provide in pertinent part that:

 1. It shall be an unlawful discriminatory practice:

 (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

 (c) For a labor organization, because of the age, race, creed, color, national origin, sex, or disability or marital status of any individual, to exclude or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer.

1609, 26 L.Ed.2d 142 (1970). Moreover, "On summary judgment the inferences to be drawn from underlying facts...must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). With these principles firmly in hand the court turns to a review of the record before it.

## I FACTUAL BACKGROUND

### A) *Plaintiff's Initial Hire*

Defendant LILCO, a combination gas and electric utility corporation, is the principal supplier of gas and electricity for Long Island, New York. The Northport Power Station (Northport) is LILCO's largest power generating facility, operating 24 hours a day, 365 days a year. Defendant Local 1049 is recognized as the exclusive bargaining agent for all of LILCO's maintenance and service employees, including those employed at the LILCO Northport facility. Defendants LILCO and 1049 have engaged in collective bargaining for these employees since 1947.

In 1968, LILCO, with the assistance of the National Alliance of Businessmen and the Nassau and Suffolk Commission on Human Rights established an employment program for the economically disadvantaged called the "JOBS" Program. Pursuant to the terms of this program LILCO undertook to provide training and employment opportunities for unemployed persons living within Nassau and Suffolk Counties. Participants in this program included the black as well as non-black "hardcore" unemployed.

At LILCO's Northport facility there are, among others, two job titles describing certain categories of manual labor. The job title of "Utilityman" is used to describe a general category of laborer requiring no special or unusual skill. The job title of "Mechanic" is used to describe a class of skilled workers. Mechanics are further broken down into five major skill categories,

viz, electrical, general mechanical, millwright, welding, and machine work. The job title of utilityman is the first in a sequence one progresses through en route to the title of "Mechanic A–1", the highest skill level a mechanic can achieve with LILCO.[4]

On August 11, 1969, plaintiff was hired into the Northport facility as a utilityman pursuant to the JOBS program. As such, plaintiff was considered to be an "over-the-complement" employee. Such an employee, in contrast to a "regular complement" employee, is one assigned on an extraordinary basis to a company department in excess of the "regular complement" of employees for that unit. Shortly after his hire, plaintiff became a member of the Local 1049 bargaining unit encompassing LILCO maintenance and service employees—including those employed at Northport.

### B) *Promotion Under The LILCO/1049 Collective Bargaining Agreement.*

At all times relevant to this case LILCO and 1049 agreed to a job posting and bidding system for regular complement employees in the Electric Production Department, including Northport, whereby permanent promotions, as well as transfers and temporary upgrades, are based upon the seniority of qualified employees. To be eligible for promotion, transfer, or temporary upgrade one must be the most *senior qualified* employee as determined in this job posting and bidding process provided for in the LILCO/1049 collective bargaining agreement.

Since 1947 two distinct types of seniority for regular complement employees have been contemplated by the LILCO/1049 collective bargaining agreement. The first, "company" seniority, begins accruing on the date the employee is hired into any department by LILCO. By contrast, "unit seniority" begins accruing on the date an employee enters on to service in a specific depart-

---

**4.** One who has successfully completed proficiency testing in each of the five skill categories is eligible to reach "Mechanic A–1" status when an opening occurs. The job posting and bidding process for vacancies at Northport is described in note 5 *infra.* Plaintiff Byrd achieved "Mechanic A–1" status early in 1980.

ment (seniority unit) as a regular complement employee. It is plaintiff's unit seniority status within the Electric Production Department at Northport which is in dispute in this case.

To be *qualified* for promotion an employee must also have satisfactorily completed a prescribed course of company-sponsored training and testing in the designated skill category, *e.g.* electrical, general mechanical, millwright, welding, or machine work. Thus, if one is determined to be the most senior qualified employee for a posted vacancy (s)he would be selected pursuant to the terms of the LILCO/1049 agreement.[5] Plaintiff also complains of the nature of this testing in the case.[6]

The LILCO/1049 seniority agreements have historically recognized a difference between "regular complement" and "over the complement" employees. Until 1968, the collective bargaining agreement did not specifically mention the status of over-the-complement employees. Rather, the defendants entered into various oral and written agreements addressing these differences. In 1968, however, LILCO and 1049 began formalizing these earlier agreements via various letter agreements.

Under these latter agreements it was confirmed that candidates for participation in the JOBS program were hired into LILCO facilities as over-the-complement employees without reference to the seniority provisions of the LILCO/1049 agreement as applied to the job posting and bidding procedure mentioned above.

Furthermore, they provided that such employees were not subject to the seniority provisions and job bidding and posting requirements applicable to regular complement employees. Finally, these agreements provided for the opportunity for JOBS employees to bid for vacancies in the regular complement group but only to the extent that such appointment did not impinge on the collectively bargained rights of regular complement employees.

It was pursuant to the terms of these latter agreements that plaintiff was hired as an over-the-complement utilityman at Northport on August 11, 1969.

C) *Plaintiff's 1971 Complaints*

On January 20, 1971, plaintiff first inquired of Mr. R. Hill of LILCO, a person responsible for employee development under the JOBS program, when he would be eligible for regular complement status at Northport. Mr. Hill responded that regular complement positions were available and that if plaintiff desired one he should participate in the posting and bidding system provided for by the LILCO/1049 agreement.

On March 12, 1971, plaintiff formally challenged differences between the seniority procedure in the JOBS and regular complement systems by filing charge TNY–1–1291 against defendants with the Equal Employment Opportunity Commission (EEOC). Shortly thereafter, on May 20, 1971, he filed a similar charge against LIL-

---

**5.** The seniority sequence under the LILCO/1049 agreement goes as follows:

First, the applicant who is the most senior qualified regular complement Local 1049 employee at Northport;
Second, the applicant who is the most senior qualified regular complement employee in the Electric Production Department of LILCO; and
Third, the applicant who is the most senior qualified 1049 employee.
It is only after this three step process is exhausted that LILCO has authority to hire other non-1049 LILCO employees or non-LILCO employees.
For a position such as Mechanic grade B, the seniority sequence begins with the most senior qualified regular complement utilityman at

Northport and then repeats this three step process.

**6.** Pursuant to a 1971 agreement between LILCO and 1049 an employee was required to demonstrate proficiency in any one skill category by successfully completing the pertinent company-sponsored tests. In preparation, the employees were given the option of either:
(1) Taking in-house training sessions followed by LILCO tests.
(2) Attending Industrial Correspondence School (ICS) followed by ICS graded tests.
(3) Training at local technical schools and then taking manual and written tests.
Plaintiff Byrd utilized all three methods en route to achieving Mechanic A–1 status. This system of testing was discontinued in 1979.

CO with the New York State Division of Human Rights. Both charges alleged that plaintiff had been denied the opportunity to become part of the regular complement at Northport because he was black and that less qualified whites had been promoted instead.[7]

On June 2 the state charges were dismissed on a finding of no probable cause. EEOC charge TNY–1–1291 was eventually dismissed by the EEOC on April 30, 1973 upon a finding of no reasonable cause to believe plaintiff's charges were true. Along with this determination the EEOC sent a document entitled "Explanation of Judicial Review" which advised plaintiff that if he wished to sue in federal court he could do so by requesting, in writing, a "Right to Sue" letter. Plaintiff first requested such a letter in December of 1982, almost ten years later. As far as the record reveals no such letter was ever issued for the 1971 charge.

The District Director, in the April 1973 determination itself, went on to note that he found reasonable cause to believe that certain of LILCO's practices with respect to treatment of minority employees violated Title VII. The determination concluded by stating that a representative of the Commission would be in touch to try and resolve these matters. In the interim, on July 12, 1971, plaintiff was selected to fill a regular complement vacancy at Northport. He was retroactively assigned a unit seniority date of August 11, 1969—the date of his initial hire as an over-the-complement employee with LILCO.

As a result of negotiations between the parties concerning the April 30, 1973 determination a conciliation agreement was subscribed to by LILCO and the EEOC on July 31, 1974 settling case No. YNY–3–412 with the EEOC.[8] That agreement provided for,

among other things, the remedying of effects of LILCO's discriminatory practices which occurred within two years prior to the signing of the agreement. One of the classes of employees specifically designated as being entitled to the benefit of the agreement was a class of blacks who sought employment with or promotion within LILCO—a class which included plaintiff.

D) *The January 1973 Seniority Adjustment*

In January 1973, while the original EEOC charges were still pending, LILCO and 1049 entered into an agreement resolving certain seniority grievances raised by eight white male mechanics at Northport. These employees contended that even though they enjoyed longer company and unit seniority at Northport than plaintiff, the retroactive fixing of plaintiff's Northport seniority date as August 11, 1969 deprived them of superior unit seniority they should have been enjoying. Accordingly, the January 1973 agreement provided for seniority status for these eight white employees superior to plaintiff's. Plaintiff's seniority date of August 11, 1969 was left intact. Defendants' justification for the adjustment was the portion of the letter agreements between defendants providing that if an over-the-complement employee bid into a regular complement position (s)he could not do so to the detriment of collectively bargained rights of regular complement employees such as these eight persons. Defendants rationalized that giving plaintiff retroactive seniority credit for time he spent at Northport as an over-the-complement employee represented just such a prohibited practice.

E) *Plaintiff's 1975 Complaints*

On August 9, 1975 plaintiff once again complained to the EEOC under the 1971 EEOC charge number TNY–1–1291 because

---

**7.** Charge TNY–1–1291 recited that:

White employees get more overtime than blacks. Blacks get overtime when there is a major shutdown or emergency. A major shutdown occurs approximately once every three months. Whites earn overtime continuously during their 40-hour work week. Mike Burke, white janitor, was promoted to utility man; he is a part of the regular com-

plement. I was hired in October, 1969 as a utility man and I am not a part of the regular complement. Blacks are treated differently than whites in the plant. I spoke to the shop steward about my complaint and they have done nothing about it.

**8.** Case YNY–3–412 was the case under which plaintiff's charge TNY–1–1291 was registered.

four B Mechanics junior to him were temporarily upgraded to Mechanic A–1. Once again he raised concerns about his company testing and his seniority status at Northport as being the reason for denial of this temporary upgrade. Shortly thereafter, on August 17, 1975, plaintiff filed new EEOC charge no. TNY–6–0222 against LILCO and TNY–6–0223 against 1049 raising similar concerns. The charges were supplemented on December 10, 1975. Both complaints were referred to the New York State Division of Human Rights which waived jurisdiction. On August 31, 1976 the EEOC issued determinations finding reasonable cause to believe that defendants' conduct with respect to plaintiff's seniority violated Title VII. It declined, however, to find similar violations with respect to plaintiff's remaining contentions. On November 9, 1976, plaintiff received notices of right to sue with respect to these two actions. On January 19, 1977, plaintiff filed a grievance under the LILCO/1049 agreement because he was bypassed for a temporary upgrade to Mechanic A–1 by one of the eight white males whose seniority was adjusted in January of 1973. The business representative for 1049 responded in writing to the grievance. He stated that resolution of the dispute would be deferred to the State and Federal Administrative bodies then considering the charges and that, in his opinion, LILCO's treatment of plaintiff was in all respects consistent with the Collective Bargaining Agreement. Plaintiff filed this suit on February 4, 1977.[9] Plaintiff ultimately achieved Mechanic A–1 status in 1980 and is presently employed at Northport in that capacity.

## II LEAVE TO AMEND

Preliminarily, the court shall dispose of defendant 1049's motion to amend its answer. Defendant moves pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to amend its answer to include the three defenses of statute of limitations, lack of jurisdiction over the state claims, and failure of the plaintiff and the EEOC to

defer the charges to the appropriate state agency pursuant to 42 U.S.C. § 2000e–5(e).

Rule 15(a) provides, in pertinent part, that

"A party may amend his pleading once as a matter of course at anytime before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within twenty days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given where justice so requires..."

■ Also instructive here is Rule 8(c) which states that certain affirmative defenses, including the statute of limitations, shall be set forth in a responsive pleading. Fed.R.Civ.Pro. 8(c). If such a defense is not so raised it is waived unless leave to amend the relevant pleading is granted. *See Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152, 1155 (2d Cir.1968).

The Supreme Court, in *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) spoke to the factors to be evaluated in considering a motion to amend. The Court held that

In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

371 U.S. at 182, 83 S.Ct. at 230.

■ Plaintiff does not oppose the motion to amend, choosing instead to rely on waiver as being an absolute and irreversible bar to amendment. (Plaintiff's Memorandum of Law at 12). As just stated, however, this is not the case. Moreover, the court has

**9.** In June of 1980 plaintiff filed and then discontinued suit 80–CV–1506 against LILCO and

1049 raising allegations of retaliatory treatment on account of his filing the instant suit.

been unable to discern the presence of any of the *Foman* factors militating against amendment on the record before it. Defendant argues that it became aware of the need to assert these defenses only after the depositions conducted in the fall of 1982 and this constitutes the reason for delay in interposing these defenses—a delay of approximately six years. Although defendant's explanation is not entirely unreasonable, in view of the web of numerous and often confusing claims plaintiff has asserted both within and without this suit, the delay would not appear to be completely justified in view of the face of plaintiff's 1977 complaint. Nevertheless, because of the liberal interpretation to be accorded Rule 15(a) and because the court is unable to find the presence of any prejudice to defendant the court is constrained to GRANT 1049's application on this point.

### III SENIORITY
### THE 1971 CHARGES

Plaintiff's 1971 EEOC charge concerned itself primarily with overtime, testing, and plaintiff's inability to bid into the regular complement rotation at Northport. With this proposition the parties do not differ.[10] They do, however, proffer radically differing interpretations of the April 30, 1973 EEOC determination. After discussing the particulars of plaintiff's charges the District Director stated, in pertinent part that:

> Thus, there is no evidence to support Charging Party's allegation of denial of overtime, terms and conditions of employment and upgrading based on his race and/or color. I conclude, accordingly, that there is no merit to the charge and find no reasonable cause to believe that Title VII was violated as alleged.
>
> This determination concludes the Commission's processing of Charging Party's complaint. Should the Charging Party wish to pursue this matter further, the enclosed *Explanation of Judicial Review* explains how Charging Party may bring a private action in federal district court. I note a degree of underutilization of minorities in Respondent Employer's em-

ploy. Respondent's application form requests information about an applicant's arrest and/or conviction record.

Also, Respondent's pre-employment tests are not validated. Such policies, absent business justification which is not shown in the record, act to deter the equal employment opportunities of minority group members, and consequently, I find reasonable cause to believe that these practices constitute a violation of Title VII (EEOC Decisions 71–1950 CCH, EPG Para. 6274; 71–2682 CCH, EPG Para. 6288). A representative of this office will contact Respondent to discuss resolution of this matter.

■ Pointing to the first two paragraphs, defendants argue that this determination marked the end of the Commission's investigation of plaintiff's charges while plaintiff points to the last paragraph as indicating that the EEOC did not in fact dismiss them. Plaintiff goes on to rely on the July, 1974 Conciliation Agreement as supporting this conclusion. Although at first blush the question would not appear to be entirely free from doubt as a result of the wording of the Director's Conclusions the court, after carefully considering the document, is convinced that *with respect to plaintiff* the April 30, 1973 determination did indeed mark the end of the EEOC's consideration of plaintiff's 1971 case.

The first part of the determination speaks quite specifically with reference to the "charging party" whereas the latter part speaks of ". . . underutilization of minorities in [LILCO's] employ" without further qualification. While it is true that plaintiff can certainly be considered to be among that class of minorities, this latter language speaks almost exclusively in terms of *pre-employment application procedures and testing.* By contrast, plaintiff's charges concerned his advancement and treatment while in the employ of the company. These latter charges, in the opinion of the Commission, were insufficient to support a finding of reasonable cause on the Title VII issue. Thus, the court is con-

---

**10.** See note 7 *supra* for text of the 1971 charge.

vinced, as a matter of law, that the EEOC's handling of plaintiff's 1971 charges was finally concluded on April 30, 1973 and that whatever rights to further judicial review he might have had necessarily accrued on that date.

■ Along with the April 30 EEOC determination, plaintiff was sent a document entitled "Explanation Of Judicial Review." Pursuant to 42 U.S.C. § 2000e–5(f)(1) and accompanying federal regulations 29 C.F.R. § 1601.25(b) and (c), as then in effect, plaintiff was advised in this document that he would have to request, within a reasonable time, in writing, a "Notice of Right to Sue" as a prerequisite to suing in federal court and that he would thereafter have ninety days from receipt of this latter Notice to institute suit in federal court. This so called "Dual-Notice" system was struck down in post-1975 cases where the Commission has issued a no reasonable cause finding. *See DeMatteis v. Eastman Kodak Co.,* 511 F.2d 306, *modified,* 520 F.2d 409 (2d Cir.1975). The system was struck down in favor of one requiring suit to be filed within ninety days of the initial no reasonable cause determination. Thus, plaintiff's 1971 EEOC charges fall under the pre-*DeMatteis* "Dual Notice" rule permitting an aggrieved plaintiff to wait a "reasonable time" before requesting the "Notice of Right to Sue".

In this case plaintiff first requested a Right to Sue Letter in December of 1982, almost ten years after the April, 1973 determination. Apparently aware of the lengthy delay, plaintiff argues for a tolling of the time limit on the basis of equitable considerations present in the case. Indeed, the tolling of the time limit for requesting a Right to Sue Letter has been sanctioned where a party can demonstrate that EEOC administrative procedures have somehow prejudiced its case. *See, e.g., Garner v. E.I. Dupont DeNemours & Co.,* 538 F.2d 611 (4th Cir.1976); *McGuire v. Aluminum Co. of America,* 542 F.2d 43 (7th Cir.1976). Here, however, no such considerations exist. Plaintiff offers no extenuating circumstances of the type present in *Garner* and *McGuire.* Unlike those cases, where a reasonable cause determination *followed by unsuccessful EEOC conciliation* attempts

made determination of the end of EEOC proceedings somewhat more difficult to ascertain, termination of the EEOC's handling of plaintiff's 1971 case was specifically marked in time. The 1973 determination, taken together with the enclosed Explanation of Judicial Review, marked that point as April 30, 1973 clearly and unequivocally. Plaintiff's failure to attempt to obtain the Right to Sue Letter until almost ten years later is inexcusable. Accordingly, the 1971 claim plaintiff asserts with respect to his obtaining regular complement status, testing and overtime are time-barred by a considerable margin. *See* 42 U.S.C. § 2000e–5(f)(1).

## IV THE 1975 CHARGES

Although defendants would characterize the bringing of 1975 EEOC charges TNY6–0222 and TNY6–0223 as being nothing more than a belated attempt to resurrect the "same" 1971 case this cannot truly be said. The August 1975 charges, which are alleged in the complaint as the jurisdictional prerequisite for this case, (Complaint para. 11), concerned themselves not with the status of plaintiff as an over-the-complement employee back in 1971 but with the entirely discrete January, 1973 seniority adjustment of the eight white male employees. Indeed, the plaintiff, in his deposition before trial, freely admits that this is one of the acts which has landed the parties before the court. Therefore, the court would reject defendants' characterization of the 1975 charges and would address them as dealing with the January 1973 seniority adjustment as well as testing.

As discussed above, the January 19, 1973 seniority adjustment was undertaken pursuant to post-1968 letter agreements between LILCO and 1049 providing that no over-the-complement employee could bid into regular complement status to the detriment of collectively bargained rights of LILCO employees. Charges TNY6–0222 and TNY6–0223, as amended, were initially filed on August 17, 1975.

■ Section 706(e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(e), pro-

vides that in a case such as this administrative charges would have had to be filed with the EEOC within 300 days after the alleged unlawful employment practice occurred. *Mohasco Corp. v. Silver,* 447 U.S. 807, 820, 100 S.Ct. 2486, 2494, 65 L.Ed.2d 532 (1980). Timely filing under this section is an absolute prerequisite to the bringing of a Title VII action. *See Electrical Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 239–240, 97 S.Ct. 441, 448–449, 50 L.Ed.2d 427 (1976); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974).

Defendants, relying principally on the case of *United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), argue that what really lies at the root of plaintiff's 1975 seniority charges is the January 1973 adjustment. They go on to argue that plaintiff's other more recent complaints dealing with his being bypassed for temporary upgrades and promotions are, in reality, complaints about the effects of the January 1973 act. In the alternative, they argue that even if the administrative charges were timely filed defendants' seniority system is a bona fide one under § 703(h) of the Act, 42 U.S.C. § 2000e–2(h) (1976).[11]

In *Evans* the Supreme Court held that the present effects of an earlier time-barred act are insufficient to constitute a present or continuing violation which can be the made subject of a timely EEOC charge. 431 U.S. 557 & n. 9, 558, 97 S.Ct. 1888 & n. 9, 1889. *See also Delaware State College v. Ricks,* 449 U.S. 250, 257–258, 101 S.Ct. 498, 503–504, 66 L.Ed.2d 431 (1980); *Cates v. Trans World Airlines,* 561 F.2d 1064, 1071 (2d Cir.1977); *Fiesel v. Board of Education,* 524 F.Supp. 48, 50 (E.D.N.Y.1981), *aff'd,* 675 F.2d 522 (2d Cir.1982). The Court, in *Evans,* stated that

A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequence.

431 U.S. 558, 97 S.Ct. 1889.

In determining the timeliness of a claim for purposes of section 706(e) a court is required "to identify precisely the 'unlawful employment practice' of which [plaintiff] complains". *Delaware State College v. Ricks, supra* 449 U.S. at 257, 101 S.Ct. at 503. Here, after reviewing the record, and resolving all doubt in favor of plaintiff, the court is convinced that the 1973 adjustment is the recurring theme which runs through and through the voluminous pleadings in the case.

Plaintiff freely concedes that the retroactive fixing of his Northport seniority date is not the problem but that the 1973 adjustment is. (Byrd Deposition 153, 221–222). Similarly, counsel states that "[s]ubsequent adverse employment decisions *based on those* adjustments . . ." constitute the foundation of plaintiff's seniority claim. (Plaintiff's memorandum in opposition at 9. Emphasis the court's). Plaintiff nevertheless goes on to characterize these employment decisions as similar to those involved in *Guardians Association of New York City v. Civil Service Commission,* 633 F.2d 232 (2d Cir.1980), *cert. granted,* 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982).

In *Guardians* the acts complained of were layoffs from the New York City Police Department pursuant to a "last-hired, first-fired" policy. Black and Hispanic members

---

**11.** Section 703(h) provides in pertinent part that:

(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . .

In view of the court's holding today it need not address the point on the merits.

of the Department brought a Title VII suit contending that because of the discriminatory nature of entry level examinations given by the Department in 1968 and 1970 the layoff policy impacted on them disproportionately. They reasoned that their delayed dates of hire were the direct result of difficulty in passing the tests which were used to promulgate eligibility lists from which persons were hired. The Second Circuit, after affirming the district court's finding that the tests were in fact discriminatory, went on to hold that for Title VII purposes the continued use of the eligibility lists based, in part, on the tainted test results constituted an ongoing violation identical in substance to a continuing refusal to hire each time a class member was bypassed for a vacancy in the Department. 633 F.2d at 251. Plaintiff here would have the court draw the conclusion that his being bypassed for promotion and temporary upgrades because of the 1973 adjustment is akin to the continuing refusals to hire in *Guardians.* Because the court finds two cases clearly distinguishable it declines the invitation.

Unlike the plaintiff class in *Guardians* plaintiff's seniority date of August 11, 1969 is conceded by plaintiff to be correct. (Byrd Deposition at 221). He does not contend that he has been deprived of the benefit of a hire date as early as a similarly qualified white person. He does not contend that "... the conduct complained of was the refusal, in the absence of any business justification, to hire [him] in a timely manner..." *Guardians,* 633 F.2d at 249.

Viewed as such, plaintiff does not set forth an unlawful refusal to hire claim, a claim which would be clearly actionable under Title VII. *Guardians* at 250. Rather, he presents a seniority claim. Moreover, it is a seniority claim which has at its core a single recurring theme—that theme being the illegality of the January, 1973 adjustment—an act which occurred well over 300 days prior to the filing of the August 17, 1975 EEOC charges. Accordingly, the court finds that the seniority portion of plaintiff's suit brought under TITLE VII must fail as being time-barred by a considerable margin. *United Air Lines v. Ev-*

*ans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

## V THE TESTING CLAIMS

Plaintiff's complaints regarding the testing system employed by LILCO from 1971–1979 stand on a somewhat different footing. Defendants do not contend that the claims concerning these tests are time-barred under Title VII. They do, however, contend that the plaintiff has failed to demonstrate a prima facie case that plaintiff's failure to obtain the promotions he sought sooner than he did was the result of the testing procedure. Plaintiff finally satisfied all testing requirements in 1979 and was thereafter promoted to Mechanic A–1 in early 1980.

In *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) the Supreme Court held that Title VII prohibits the use of facially neutral employment practices which have a disproportionately negative impact among certain minority groups unless the employer can demonstrate that the practice has a manifest relationship to the job. *See also U.S. Postal Service v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). In *Albemarle Paper Company v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Court went on to hold that the employer's burden of showing this job relatedness only arises after plaintiff has made out a prima facie case establishing that the practice in question has the effect of selecting applicants for hire in a racial pattern significantly different from that of the entire pool of applicants. 422 U.S. 425, 95 S.Ct. 2375. *See also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Here, he must prove that the testing requirements disproportionately prevented blacks from advancing. *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). Where a plaintiff sustains his obligation of showing such a *prima facie* case a rebuttable presumption of discrimination against

him arises. *Pena v. Brattleboro Retreat,* 702 F.2d 322, 324 (2d Cir.1983). Defendants here contend that plaintiff has failed to establish a *prima facie* case of disparate treatment.

Defendants argue that plaintiff's testing claim concerns itself not with anything that they have done in designing the test but rather with plaintiff's inability to pass tests of any kind due to the inferior schooling he received in Gaston County, North Carolina when he was a child.[12] They also argue that plaintiff has thus far failed to proffer any statistical evidence of a disparate impact of these tests on blacks. Specifically, they point to the fact that non-blacks as well as blacks had difficulty in passing the tests and that in any event, the tests were completely job related. Finally, as evidence of their good faith, they point to their attempts to compensate for plaintiff's educational disabilities by allowing him to respond orally to certain portions of the examinations, by relaxing the skill requirements for temporary upgrades in 1977, and by altering the testing requirements in 1978 in response to the complaints of a group of black and non-black employees including plaintiff. They argue that advancement at LILCO was solely a function of impartial application of neutral testing criteria to all persons, regardless of color. On the record the court has before it, it is compelled to agree.

The action is now over six years old. To date all plaintiff has been able to establish is that he found himself among a group of black and non-black employees—in statistically insignificant proportions—which had difficulty in passing the LILCO sponsored examinations.

Plaintiff failed the in-house basic electricity course on January 19, 1971 with a score of 37. Two white employees also failed that test. All three subsequently failed that test again with plaintiff scoring only a 27. Despite having failed the Electric Arc Welding examination plaintiff was promoted to Mechanic B on May 12, 1972. Until 1975 plaintiff utilized LILCO sponsored training to prepare for these examinations. After this he switched to the ICS home study course which he didn't successfully complete until 1979.

In 1977 plaintiff filed a grievance regarding LILCO's temporary promotion policy. Pursuant to that policy, an employee who had already demonstrated proficiency in a skill area by passing the required test could be temporarily upgraded to positions they were not permanently assigned to where manpower needs dictated. The policy was applied to black and non-black alike. In response to plaintiff's complaint that he should be permitted to participate in such temporary upgrades despite not having passed the company tests, LILCO and 1049 negotiated an agreement whereby those who had not yet passed the required tests could be temporarily upgraded under specified closely controlled conditions. The new policy was applied to black and non-black alike.

In 1978 plaintiff, along with another black employee, as well as two whites, lodged a grievance challenging the job related content of the LILCO tests. He complained that two white and two black employees—two of whom had less unit seniority—had been promoted ahead of them. In 1979 LILCO and 1049 revised the training and testing requirements by eliminating all but LILCO training and by toughening the tests.

Rule 56(e) provides in pertinent part that "When a motion for summary judgment is made .... an adverse party may not rest on the mere allegations or denials of his pleading, but his response .... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e). Plaintiff's 9(g) statement of material fact and memorandum of law, viewed most charitably, assert nothing more than plaintiff's individual difficulty in passing the tests. Nowhere do they speak of a disparate impact of the tests on blacks as a

---

**12.** Plaintiff cites to *Griggs, supra* as well as *Gaston County, North Carolina v. United States,* 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969) for the proposition that the education he received in North Carolina was inferior to what white children received.

group. (Plaintiff's 9(g) statement ¶ 40; Memorandum in opposition at 7). Viewing the record in a light most favorable to plaintiff, *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 the most that can be said of the testing claim is that it complains of plaintiff's individual difficulties with the tests and not of any adverse effect of the tests on blacks as a group. Moreover, plaintiff relies to a significant degree for this claim not on actions taken by defendants but on the actions of those who educated him in Gaston County, North Carolina. (Plaintiff's 9(g) statement at ¶ 3). He argues that the inferior education he received by virtue the "separate but equal" education he was given left him unprepared to successfully complete the LILCO tests.

Under *Griggs* adverse *individual* impact is insufficient to sustain a Title VII claim for discriminatory employment practices. Here plaintiff offers no statistically significant evidence whatsoever that the LILCO testing had the effect of selecting non-blacks for promotion at a rate any higher than blacks. Moreover, he offers no evidence of any prohibited racial animus directed against him individually. He offers nothing more than the difficulties he alone had in passing the tests.

Accordingly, there appears to be no genuine issue of material fact surrounding the point and defendants are entitled to judgment as a matter of law. Summary judgment on the merits of plaintiff's Title VII testing claims is therefore granted in favor of defendants. *See Wade v. New York Telephone Co.,* 500 F.Supp. 1170, 1178 (S.D.N.Y.1980).

## VI THE 1981 CLAIMS

Defendants move for summary judgment on the § 1981 claims on some of the same grounds as they move on the Title VII claims. Specifically, defendants assert that plaintiff's seniority claim is time-barred under § 1981. In the alternative, they argue that if this claim is not time-barred summary judgment on the merits is appropriate. In addition they argue that summary judgment on the merits of the testing claims under § 1981 is warranted.

Section 1981, which provides a remedy for employment discrimination on the basis of race, carries no statute of limitations of its own. Instead federal courts, in applying § 1981, are to apply the state statute of limitation for the most closely analogous state cause of action. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). Accrual of the cause of action is, however, a matter determined solely by reference to federal law. Under that law a cause of action for deprivation of rights under § 1981 accrues when "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir. 1980) (*quoting Bireline v. Seagondollar,* 567 F.2d 260, 263 (4th Cir.1977)). *See also Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 39, 70 L.Ed.2d 6 (1981); *Pauk v. Board of Trustees of City University of New York,* 654 F.2d 856, 859 (2d Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982); *Kaiser v. Cahn,* 510 F.2d 282, 285 (2d Cir.1974).

In New York the three year statute of limitations contained in section 214(2) of the New York Civil Practice Law and Rules governs. *Goss v. Revlon,* 548 F.2d 405, 407 (2d Cir.1976), *cert. denied,* 434 U.S. 968, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). Moreover, this statute is not tolled by the filing of administrative charges with the EEOC. *Johnson v. Railway Express Agency, Inc., supra* at 466, 95 S.Ct. at 1723.

Viewing the 1973 adjustment as the crux of plaintiff's seniority claim, as it must, the court finds it clear that his seniority claim under § 1981 is clearly time barred—as suit on it was not commenced until February 4, 1977—over four years after the January, 1973 adjustment.

Turning to the testing portion of the § 1981 claim defendants do not object to it as being time-barred but do oppose on the merits.

Title VII and § 1981 both offer black plaintiff's protection against employment discrimination, *Guardians Association,*

*supra* at 266. Although the question is not entirely free from doubt, a showing of discriminatory purpose, as opposed to mere impact, is required to sustain a § 1981 claim in this circuit. *Id.* at 267. Defendants, in support of their motion on this issue, point to the lack of evidence of such a purpose with respect to plaintiff. Again, plaintiff points to his own inability to successfully complete the LILCO tests until 1979. The record fails to yield anything which would suggest in any way that LILCO had an evil or discriminatory purpose in mind when considering and designing the tests given from 1971–1979. Significantly, plaintiff fails to even address the § 1981 intent issue in his memorandum in opposition. Nowhere does he even try to isolate facts or circumstances which he considers indicative of a prohibited racial motive or intent. Accordingly, there does not appear to be genuine issue of material fact with respect to the § 1981 testing claim and defendants are entitled to judgment as a matter of law. *Guardians, supra* at 267. The motion is, therefore, granted with respect to plaintiff's § 1981 testing claim.

## VII FAIR REPRESENTATION CLAIM

■ Plaintiff sues 1049 under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), for its failure to adequately represent him in connection with the 1973 seniority adjustment. Although the LILCO/1049 agreement provided for a grievance arbitration machinery it was not employed with respect to this claim. Indeed plaintiff, at the time, did not even proffer a grievance for resolution.

In *Flowers v. Local 2602 of the United Steel Workers,* 671 F.2d 87 (2d Cir.), *cert. granted,* —— U.S. ——, 103 S.Ct. 442, 74 L.Ed.2d 599 (1982) the Second Circuit recently held that because fair representation claims against unions were most closely analogous to malpractice claims under state law the pertinent limitations period under that state law must be referenced on the issue. 671 F.2d 91. In New York that would be the three year period currently contained in section 214(6) of the N.Y.Civ. Prac.Law and Rules (McKinney Supp.1982). Because plaintiff's complaint in this action

was not filed until February 4, 1977, over four years after the January, 1973 adjustment of which he complains, plaintiff's section 301(a) claim is time-barred and 1049's motion with respect to it is, therefore, GRANTED. *See also Assad v. Mount Sinai Hospital,* 703 F.2d 36 (2d Cir.1983).

## VIII THE 1974 CONCILIATION AGREEMENT

■ Proceeding from the premise that plaintiff was not a party to the 1974 conciliation agreement entered into between it and the EEOC, LILCO argues that plaintiff cannot now sue to enforce it because he lacks standing to do so. LILCO argues that allowing a disinterested third party such as plaintiff to sue would undermine the statutory preference for conciliation as opposed to litigation. 42 U.S.C. § 2000e–5(b). *See Occidental Life Insurance Co. v. EEOC,* 432 U.S. 355, 368, 97 S.Ct. 2447, 2455, 53 L.Ed.2d 402 (1977); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). Finally LILCO argues that permitting plaintiff to sue on the agreement would run afoul of the nondisclosure provision relating to conciliation agreements contained in 42 U.S.C. § 2000e–5(b). After considering LILCO's arguments the court finds that they fail on two levels.

Initially the court is not convinced that plaintiff was not a "party" to the agreement. It is true that plaintiff's signature was not affixed to the agreement. It is also true, however, that plaintiff was among one of the designated classes to be benefitted by the agreement. Specifically, plaintiff was among a group of blacks who sought employment or promotion within the company. Defendant's reliance on the cases of *General Telephone Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980); *Reed v. Arlington Hotel Co.,* 476 F.2d 721 (8th Cir.), *cert. denied,* 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); and *Williamson v. Bethlehem Steel,* 468 F.2d 1201 (2d Cir. 1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1893, 36 L.Ed.2d 390 (1973) is misplaced.

The *General Telephone* case merely stands for the proposition that civil suits brought by the EEOC, as opposed to private plaintiffs, need not comply with the class certification requirements of Rule 23 of the Federal Rules of Civil Procedure. 446 U.S. 324, 100 S.Ct. 1703. It in no way limited the right of a private litigant who was included in a group to be benefitted by a private conciliation agreement to bring a suit for noncompliance with the agreement. To be sure, the court specifically recognized that the public interest to be served by EEOC instituted litigation was distinct from that to be gained by private enforcement and on that basis held that a private Title VII right of action was not supplanted by an EEOC suit. *Id.* at 332–333, 100 S.Ct. at 1707–1708. Similarly, *Williamson v. Bethlehem Steel Corp.* involved a pre-1972 public suit brought by the Attorney General. *Reed v. Arlington Hotel* merely stands for the proposition that one who has rejected a proposed EEOC settlement of a Title VII grievance involving wrongful discharge has standing to sue nevertheless. 476 F.2d 721. The court has not been directed to nor can it find any case holding that a member of a class specifically designated in a *private* Title VII conciliation agreement is without power to seek judicial enforcement of that agreement in the federal courts.

The court finds this case more closely analogous to *Perdue v. Roy Stone Transfer Corp.*, 690 F.2d 1091 (4th Cir.1982). The issue before the court there was whether the absence of a right to sue letter under 42 U.S.C. § 2000e–5(f)(1) was a jurisdictional bar to a suit seeking enforcement of a private conciliation agreement. In holding that it wasn't, the court held that:

> In effect, the district court's reading of § 2000e–5(f)(1) was that a claimant forever loses his entitlement to a "right to sue" notice, and hence his right to seek redress in federal court, when he enters into a settlement agreement even if the employer who purportedly settled never had any intention of honoring the agreement. The plain language of the statute does not command this inequity; we will

impose such a harsh result only if the policies embodied in the statute clearly so require.

690 F.2d 1093.

 The court finds the reasoning of the Fourth Circuit compelling and would agree with it. It would not so narrowly restrict a private grievant's opportunity to enforce a private conciliation agreement absent the clearest expression of such a policy by Congress.

Thus, to the extent plaintiff purports to state a cause of action under the 1974 conciliation agreement he states a viable cause of action inappropriate for summary judgment. Motion on this point DENIED.

## STATE PENDENT CLAIMS

Plaintiff asserts for a pendent state claim violations of the New York Human Rights Law, N.Y.Exec.Law § 290 *et seq.* (McKinney 1982). Again, he asserts that defendants' seniority and testing arrangements are discriminatory and hence fall within the proscription of this statute. N.Y.Exec.Law § 296 (McKinney 1982).[13] Defendants move for summary judgment on this portion of the action on grounds that it is time-barred, and, alternatively, on the ground that if the motion on the federal claims is granted a basis for exercise of pendent jurisdiction no longer exists. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In view of the court's holding today it declines to grant the motion on the latter ground. It finds that because the state claim and remaining federal cause of action based on enforcement of the 1974 conciliation agreement both "... derive from a common nucleus of operative fact" and plaintiff "... would ordinarily be expected to try [them] in one judicial proceeding" the court possesses pendent jurisdiction which should be exercised here. *United Mine Workers v. Gibbs,* 383 U.S. 725, 86 S.Ct. 1138.

 The three year statute of limitations contained in section 214(2) of the New

---

**13.** See note 3 *supra* for the text of the statute.

York CPLR governs claims brought under section 297(9) of the New York Human Rights Law. *See Murphy v. American Home Products,* 58 N.Y.2d 293, 461 N.Y. S.2d 232, 448 N.E.2d 86 (1983). Moreover, a claim accrues when the plaintiff first learns of the acts he complains of. *Board of Education v. New York State Division of Human Rights,* 56 N.Y.2d 257, 451 N.Y.S.2d 700, 436 N.E.2d 1301 (1982); *Queensborough Community College v. State Human Rights Appeal Board,* 41 N.Y.2d 926, 394 N.Y.S.2d 625, 363 N.E.2d 349 (1977). Here, where the court finds that the nub of plaintiff's seniority claim is an adjustment which occurred in January 1973—more than four years prior to institution of suit in February of 1977—the court finds this portion of the state claim time-barred by a considerable margin.

With respect to the testing portion of the state claim the court notes that neither defendant addresses the issue on either statute of limitations or substantive grounds. Accordingly, then this portion of defendants' motion is DENIED.

## CONCLUSION

In sum then, and for all of the foregoing reasons, defendants' motions for summary judgment on the Title VII, § 1981, and seniority portion of the N.Y. Human Rights Claims are GRANTED. The motions on the testing portion of the State claim are denied. Local 1049's motion for summary judgment on the 301 claim is GRANTED. Defendant LILCO's motion for summary judgment on the 1974 conciliation claim is DENIED.

IT IS

SO ORDERED.

## SUPPLEMENTAL MEMORANDUM AND ORDER

Plaintiff, the Rev. Herbert Byrd, as well as defendants Long Island Lighting Company (LILCO) and Local 1049 (1049) all move for reargument of portions of the court's June 9, 1983 decision in this matter. 565 F.Supp. 1455 (E.D.N.Y.1983). On that date, the court granted defendants' motions for summary judgment on plaintiff's Title VII and section 1981 claims. In addition, it granted their motions with respect to plaintiff's seniority claim brought under section 296 of the New York State Human Rights Law. Finally, it granted 1049's motion on plaintiff's unfair representation claim and denied LILCO's motion with respect to plaintiff's cause of action based on the 1974 conciliation agreement. Familiarity with that decision is assumed.

## PLAINTIFF'S APPLICATION

Rule 9(m) of the Local General Rules for the Eastern District of New York provides that where "... matters or controlling decisions which counsel believes the court has overlooked." are presented the court may modify its earlier decision. Here, plaintiff contends that the court's initial determination that plaintiff failed to establish any evidence of disparate impact for purposes of Title VII or 42 U.S.C. § 1981 is erroneous. In support plaintiff cites no decision or authority that was not previously brought to the court's attention. Moreover, the court can find no reason to depart from its prior ruling on the point. It accordingly DENIES plaintiff's motion. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

## LILCO'S APPLICATION

In the June 9 decision the court declined to direct entry of summary judgment in LILCO's favor on the testing portion of plaintiff's pendent state law claim on a finding that LILCO had not briefed the issue. Today it moves for reargument under Rule 9(m) or, in the alternative, for consideration anew as a supplemental motion under Fed.R.Civ.Pro. 56(b). In support, it argues that because the legal standards governing discrimination claims brought under section 296 of the state Human Rights Law are at least as high as those governing Title VII and § 1981, and because the court granted LILCO's motion on these latter federal claims, summary judgment is appropriate. After considering LILCO's additional arguments the court hereby GRANTS the application and directs

the entry of summary judgment in LILCO's favor under Rule 56(b).

The New York Court of Appeals has on at least two occasions cited with approval the use of the Title VII disparate impact standard in discrimination cases brought pursuant to section 296 of the New York Executive Law. *See, e.g., State Division of Human Rights v. Kilian Manufacturing Corp.,* 35 N.Y.2d 201, 360 N.Y.S.2d 603, 318 N.E.2d 770 (1974), *appeal dismissed,* 420 U.S. 915, 95 S.Ct. 1108, 43 L.Ed.2d 387 (1975); *Sontag v. Bronstein,* 33 N.Y.2d 197, 351 N.Y.S.2d 389, 306 N.E.2d 405 (1973). Indeed, the New York courts have on a few occasions required a showing of more than disparate impact based on statistical evidence where discriminatory employment practices are alleged. *E.g., State Division of Human Rights v. Xerox Corp.,* 49 A.D.2d 21, 370 N.Y.S.2d 962 (4th Dept.1975) (requirement that court consider the facts of each case individually in addition to statistical profile generated by aggregate of all cases).

Plaintiff, while conceding the identity of legal standards applicable to his Title VII and New York claims, nevertheless argues once again that an additional consideration in his case should be the inferior schooling he received in the Gaston County North Caroling public schools. He also argues once again that the fact that he initially had difficulty passing the LILCO tests is probative on the issue of discrimination. For the same reasons the court rejected these arguments in its opinion of June 9 it rejects them today and, on the basis of the similarity of legal standards is compelled to grant the motion. MOTION GRANTED.

LOCAL 1049'S APPLICATION

■ The union argues that because it was not a signatory to the July 1974 Conciliation Agreement which forms the basis of Count III of plaintiff's complaint the only remaining federal claim against it fails and, as a consequence, so does the court's power to hear and adjudicate the pendent state claim. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In addition it argues, as LILCO does, that because the legal standard governing the state testing claim is at least as high as that governing the federal claims, and because summary judgment was granted on the latter, entry of summary judgment on the state testing claim is appropriate. After reviewing the record and the decision of June 9 the court is of the opinion that it did not adequately address 1049's motion made with respect to the 1974 conciliation agreement. Accordingly, it addresses it today.

Despite acknowledging the inherent common sense of dismissing his conciliation claim against the union plaintiff faults 1049 for not citing any legal authority in support. In addition, he argues that 1049's participation in the negotiation of the 1974 agreement is a sufficient basis on which to ground this claim. The court finds neither contention persuasive.

What plaintiff seeks in Count III can be most properly characterized as enforcement of the 1974 Agreement in vindication of his rights. In many respects it is no different than suit on a contract. In pursuit of his rights he seeks to compel LILCO, and not Local 1049, to remedy what he perceives to be certain violations of the 1974 Agreement. The union's participation in the negotiation and drafting of the settlement, even if it were substantiated, could in no way be interpreted in a manner that would bind it, a non-signatory to the terms of the agreement.* Therefore, the court rejects plaintiff's contentions on the point and GRANTS Local 1049's motion for grant of summary judgment on the point.

■ The Supreme Court, in *Gibbs,* counsels that where all underlying federal claims are dismissed on the merits prior to trial any remaining state claim should be dismissed as well. 383 U.S. 726, 86 S.Ct. 1139. Unlike the case of LILCO, which remains in the case by virtue of plaintiff's claim that it violated the 1974 Conciliation

---

* To the extent that LILCO would make dismissal of the conciliation claim against 1049 contingent on dismissal of the claim against LILCO it raises a new issue in an untimely fashion under Rule 9(m).

Agreement, no independent federal claim against 1049 remains in view of the court's decision today. Accordingly, the court, under the teachings of *Gibbs,* finds itself without jurisdiction to address the remaining state testing claim against LILCO and accordingly dissmisses it reluctantly.**

### CONCLUSION

Decision and Order of June 9, 1983 modified to the extent set out above. The Clerk of the Court is directed to amend the caption of the case by deleting 1049 as a defendant.

SO ORDERED.

---

** All indications are that a result similar to that arrived at with respect to the state testing claim against LILCO would obtain here. The court, however, expresses no opinion on the issue today.